RAYNOR, The. See Case No. 9,267.

RAYNOR (WILLIAMS MOWER, ETC., CO. v.). See Case No. 17,748.

## Case No. 11,598.

### The R. B. FORBES.

[1 Spr. 328; [1] 19 Law Rep. 544.]

District Court, D. Massachusetts. Oct. 25, 1856.[2]

COLLISION—TUG WITH TOW—LIGHTS—ARRANGEMENT OF LIGHTS—RIGHT OF WAY.

1. Where a ship without sails, was lashed to a steamer alongside, and so towed, the steamer furnishing the whole motive power, and the ship came in collision with a sailing vessel, the steamer was held responsible.
[Cited in Nelson v. The Goliah, Case No. 10,-106; The Belknap, Id. 1,244.]

2. If the night was so dark, that a sailing vessel coming up Boston harbor could not be seen from the ship and steamer, in season to avoid a collision, it was not proper for the latter to leave the wharf and go down the harbor.
[Cited in Judd Linseed, etc., Co. v. The Java, Case No. 7,559.]

3. There is no imperative rule that requires a sailing vessel to show a light. But if she neglect to do so, when a light would have been seen, and a collision thereby prevented, she will not recover damages.

4. Placing powerful lights near the bows of a ship, in such a position as to prevent the lookout from seeing ahead, is blamable.

5. Where a steamer and a sailing vessel are approaching each other, it is the duty of the

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]
[2] [Affirmed by Case No. 11,275.]

latter to keep her course, and of the former to keep clear.
[Cited in The Sunnyside, Case No. 13,620; The Plymouth, 26 Fed. 880.]

[This was a libel by William Pope and others against the steamboat R. B. Forbes, Charles Pearson, treasurer, claimant, for damages resulting from a collision.]

Charles E. Pike, for libellants.

H. F. Durant and M. Dyer, Jr., for claimants.

SPRAGUE, District Judge. This is a libel in rem, against the steamer R. B. Forbes, for damages caused by collision between the schooner Eliza, owned by the libellants, and the Romance of the Seas, a ship of about 1600 tons, towed by the steamer and lashed to the steamer's side. The steamer is a towboat of about 350 horse power. The schooner was lumber-laden, and was beating up Boston harbor on the evening of June 4th, and the collision took place about 10 o'clock, somewhere between Long Island light and the Castle.

The first question presented is: Whether the steamer can be liable?

It is contended, in the defence, that the steamer was the mere motive power; that she was the servant of the ship; that the whole control of both ship and steamer was in the owner of the ship; and therefore, that the ship, or her owners, are alone liable.

It is to be observed, that the ship had no motive power of her own. Her sails were furled, and whatever motion she had was imparted to her by the steamer. The only separate motion which the ship could have would be such lateral motion as might result from a change of her rudder. The ship and the steamer were so lashed together as to constitute one moving mass, whose momentum was the result of the steamer's motive power acting upon the aggregate bulk and weight of both ship and steamer. The steamer had the control of the ship; and if there was negligence in causing the collision, the steamer must be held liable.

The fact that the steamer was hired for the service of towage, can make no difference. This is a proceeding in rem, and not in personam. Generally, in a suit in rem, no regard is had to the ownership. One great benefit of such a proceeding is, that the law puts its hand on the offending thing, and, without inquiring who is the proprietor, gives a remedy in favor of the injured party, against the vessel itself which has caused the damage.

It is not necessary, in this case, to decide whether the ship is also liable. That is not now before me for consideration.

It has been contended that the steamer was under the control of the officers, or of the pilot of the ship. But if such were the fact, it would not exonerate the steamer, nor affect her liability as to third persons. But the fact of such control is not proved. The

testimony of both the captain and mate of the steamer show that the orders, at and about the time of the collision, were given, chiefly, by the officers of the steamer. It did not appear that the master of the ship took any part in the direction, at that time.

It is contended that the fault was on the part of the schooner; or that the accident was inevitable.

As to the latter, the more intelligent witnesses, on both sides, testify that the night was slightly overcast, with stars appearing here and there, and that the schooner could be seen at a considerable distance,—far enough to have been avoided with due precaution. Several of the witnesses for the defence, it is true, say that the night was very dark. But if it was so dark that the schooner could not be seen, then it was not a night for such a large ship and so powerful a steamer to have left the wharf to go down the harbor, where vessels are very numerous, both outward and inward bound. In either view it is not a case of inevitable accident.

Where, then, was the fault? It is contended that the schooner did not show a light, and that this was culpable negligence. [So far as a look-out is concerned, I am satisfied that the ship and steamer had a good look-out both in numbers and character. And it is also testified that the schooner had a good look-out. The witnesses for the libellants also say that, when the ship and steamer were half a mile off, a light was taken from the schooner's binnacle and shown, in full view, until the collision was inevitable.] [3] There is no imperative rule that required her to show a light. But if traversing these waters in the night time, where steamers may be expected, she omitted to do so, she ought not to recover damages against the steamer, if the latter had a good look-out which would have seen a light and prevented the collision; for a steamer using due care and skill has a right to run, when the night is such that a suitable light can be seasonably discovered. But the evidence shows that she did, in fact, exhibit a sufficient light. [There were four persons on the deck of the schooner, and they all say that a light was shown in a conspicuous place above the deck load, and state all the attending circumstances. One or two persons also on board the ship say they saw a light just before the collision.] [3] (The judge here went into an examination of the evidence.) The schooner does not appear to have been in fault. How was it with the ship and steamer? They had a good look-out, both in numbers and character, and yet they failed to discover the schooner's light in season, although the night was such that it ought to have been seen. Why did they not see it? Solely, in my judgment, because the lights on the ship and steamer were unskilfully placed. Powerful

lights were placed near the bows of the ship, directly in the line of vision of those on the look out. Here was the fault. And this accounts for the testimony of some of the witnesses, who were on the look out, that the night seemed to them very dark, and that they could see only a short distance ahead. There was a great mistake in the arrangement of the lights. According to the defendant's own witnesses, they were so placed as effectually to prevent a view directly ahead. This also accounts for the contradiction in the testimony respecting the position of the vessels, when they came together. All the witnesses on board of the ship and steamer say, that when they first saw the schooner she was lying across the ship's bows; that she appeared to be just going in stays; and that the ship struck her bowsprit at a right angle with the ship's keel. All those on board of the schooner say that she did not go in stays, but was close hauled on the wind, and that the vessels came together nearly "head on," or at an angle of only one or two degrees. From an inspection of the bowsprit, a part of which has been brought into court, I am convinced that the first blow must have been made by a vessel approaching from nearly an opposite direction, and not at a right angle. And the sudden and near appearance of the schooner, as testified to by the witnesses for the defence, still farther confirms the belief that she was not seen, until the projecting jib-boom of the ship had begun to press her round, and to give her the appearance of going in stays under the ship's bow.

It has been contended, that inasmuch as the schooner saw the steamer a mile off, the schooner should have kept clear of the steamer. But the rule of the sea is, that a sailing vessel is to keep on her course, and it is the duty of the steamer to avoid her. The schooner had a right to believe, and to act upon the belief, that the steamer would diverge at the proper time to go clear. If the schooner had diverged, and in consequence thereof had come in collision with the steamer or ship, she would have been in fault.

I am of opinion that the schooner was not in fault, but that there was fault on the part of those in charge of the steamer and ship, and that the steamer is liable for the damages resulting from the collision. Decree for the libellants.

[On appeal to the circuit court, this decree was affirmed. Case No. 11,275.]

NOTE. See acc. Sproul v. Hemmingway, 14 Pick. 1; and as to liability of steam-tugs towing barges and canal boats, The John Counter, Stu. Adm.; The Express [Case No. 4,596]. But see Smith v. The Creole [Id. 13,033]; The Sampson [Id. 12,280]; The Duke of Sussex, 1 W. Rob. Adm. 270; The Gypsey King, 2 W. Rob. Adm. 537; The Christiana, 3 W. Rob. Adm. 27; The Kingston-by-Sea, Id. 152. As to the rule of the sea, see The Oregon, 18 How. [59 U. S.] 570; Haney v. Baltimore Steam Packet Co., 23 How. [64 U. S.] 292, and The Osprey [Case No. 10,606].

---

[3] [From 19 Law Rep. 544.]